]UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
HIGHLAND CAPITAL MANAGEMENT, L.P.,

                                       :

                Plaintiff,

                                         :

           -v.-

                                         :

LEONARD SCHNEIDER, LESLIE SCHNEIDER,
SCOTT SCHNEIDER, SUSAN SCHNEIDER,   :
and JENKENS & GILCHRIST PARKER CHAPIN
LLP,                                          :

                Defendants.       :
----------------------------------------------------------------X     <u>OPINION AND ORDER</u>
                                                          02 Civ. 8098 (PKL) (GWG)

----------------------------------------------------------------X
LEONARD SCHNEIDER, LESLIE SCHNEIDER,
SCOTT SCHNEIDER, and SUSAN SCHNEIDER   :

                Third- Party Plaintiffs,      :

       -v.-                                   :

RBC DOMINION SECURITIES CORP.,        :

                Third-Party Defendants and   :
                Counterclaimant.
----------------------------------------------------------------X
APPEARANCES:

Paul B. Lackey, Jamie R. Welton, Deborah Deitsch-Perez
Lackey Hershman, L.L.P., Dallas, Texas
Attorneys for Plaintiff

Katherine C. Ash, Troutman Sanders LLP,
New York, NY
Attorney for Defendants

Jack Yoskowitz, Seward & Kissel LLP
New York, NY
Attorney for Third-Party Defendants

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
HIGHLAND CAPITAL MANAGEMENT, L.P.,
                                                    :

                    Plaintiff,
                                                    :

              -v.-
                                              _____:
LEONARD SCHNEIDER, LESLIE SCHNEIDER,
SCOTT SCHNEIDER, SUSAN SCHNEIDER,               :
and JENKENS & GILCHRIST PARKER CHAPIN
LLP,                                            :

                    Defendants.                 :
-------------------------------------------------------------X          OPINION AND ORDER
                                                                        02 Civ. 8098 (PKL) (GWG)
-------------------------------------------------------------X
LEONARD SCHNEIDER, LESLIE SCHNEIDER,
SCOTT SCHNEIDER, and SUSAN SCHNEIDER  :

                    Third- Party Plaintiffs,    :

              -v.-                              :

RBC DOMINION SECURITIES CORP.,                  :

                    Third-Party Defendants and  :
                    Counterclaimant.
-------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

        Plaintiff Highland Capital Management, L.P. ("Highland") brings this action against

defendants, Leonard Schneider, Leslie Schneider, Scott Schneider, Susan Schneider (the

"Schneiders") and Jenkens & Gilchrist Parker Chapin LLP ("JGPC") (collectively "the

defendants") to recover damages based on the Schneiders' alleged failure to consummate a

transaction involving promissory notes issued by McNaughton Apparel Group, Inc.

("McNaughton").  Highland alleges that the Schneiders agreed to sell it the notes but then

reneged on the agreement after they received inside information that caused them to believe the notes would increase in value. In its third amended complaint, Highland has set forth a variety of claims for relief against the defendants, including breach of contract, tortious interference with contractual relations, and tortious interference with prospective contractual and business relations. Defendants now move in limine for an order excluding the testimony of Highland's proposed expert witness, Sean F. O'Shea ("O'Shea").

As discussed below, O'Shea's proposed testimony consists of a summary of the evidence in the case from Highland's perspective, a description of federal securities laws, and an assertion that those laws were violated by various individuals. It concludes with the speculation that a federal prosecutor presented with Highland's version of the events would "likely" pursue a criminal investigation of these individuals and seek their indictment. Because this testimony is inadmissible, and because O'Shea's speculation regarding how a prosecutor would treat this case is simply irrelevant to any claim asserted by Highland, defendants' motion to exclude it in its entirety is granted.

I. BACKGROUND

   A. The Amended Complaint

In its amended complaint, Highland alleges that, prior to April 15, 1998, the Schneiders owned and operated companies, Jeri-Jo Knitwear, Inc. and Jamie Scott, Inc. (collectively, "Jeri-Jo"), which made junior active apparel. Plaintiff's Third Amended Complaint (reproduced as Ex. 4 to Defendants' Notice of Motion to Exclude Proposed Expert Testimony of Sean O'Shea ("Notice of Motion")) ("Am. Compl."), ¶ 9. On April 15, 1998, McNaughton purchased substantially all of the assets of Jeri-Jo. Id. Under the terms of the deal, McNaughton made an

initial payment, assumed debt, and obligated itself to make a "future earn-out payment" to the Schneiders based on the performance of Jeri-Jo over the course of the following two years.  Id.

Once Jeri-Jo was sold to McNaughton, Leonard Schneider, the patriarch of the Schneider family, ended his association with Jeri-Jo.  Id. ¶ 10.  Leslie, Susan and Scott Schneider (the "Schneider Children") remained as operating executives at Jeri-Jo and entered into employment agreements under which they reported directly to Peter Boneparth, the President and Chief Executive Officer of McNaughton.  Id.

On August 3, 2000, the terms of the sale agreement were amended to provide for the retirement of the future earn-out payment through a combination of cash, stock and promissory notes.  Id. ¶ 13.  McNaughton issued eight promissory notes totaling $69 million (the "Notes"), to the Schneiders.  Id. ¶ 21.

Highland avers that, in November 2000, an officer of McNaughton forwarded "confidential" information to the Schneiders detailing McNaughton's financial condition.  See id. ¶ 18.  Between January and May 2001, Leonard Schneider sold approximately 693,000 shares of McNaughton stock.  Id. ¶ 39.  Highland alleges that, because the McNaughton officer was aware of the volume of shares being sold and that the Schneider Children were "exiting the company," the officer "surmised" that the Schneiders were "engaged in an effort to dump their McNaughton stock . . . ."  Id. ¶ 40.

In late 2000 and early 2001, the Schneiders sought to sell the Notes.  See id. ¶¶ 23-24. The Schneiders allegedly retained Glen Rauch ("Rauch") of Glen Rauch Securities, Inc. to begin marketing the Notes for sale.  See id. ¶¶ 19, 23.  By letter agreement dated January 5, 2001, Rauch in turn retained RBC Dominion Securities Corporation ("RBC") "to market the Notes on

behalf of the Schneiders." Id. ¶ 24. After Highland was identified as a potential purchaser of the Notes, a conference call was arranged involving RBC, Rauch, JGPC (as the Schneiders' counsel), and Highland. See id. ¶¶ 19, 29; see also Affidavit of Katherine C. Ash in Support of Motion to Exclude Proposed Expert Testimony of Sean O'Shea, dated February 9, 2005 (annexed to Notice of Motion) ("Ash Aff."), ¶ 23 (explaining the various transactions in which JGPC represented the Schneiders).

Highland alleges that, "[o]n the morning of March 12, 2001, Rauch – with the consent and on the behalf of the Schneiders – offered to sell RBC all $69 million of the Notes at 51 cents on the dollar." Am. Compl. ¶ 34. Highland also alleges that on March 14, 2001 "RBC confirmed the trade orally with Rauch." Id. ¶ 36. Highland alleges that, "subject to documentation," the trade consisted of Rauch buying "all the Notes from the Schneiders at 51 cents on the dollar and to sell approximately $45.4 million to Highland . . . at 52.5 cents on the dollar (the spread being the commission paid to RBC)." Id. The remaining $23.6 million portion of the Notes was to be sold to another purchaser – also "at 52.5 cents on the dollar." Id. At this point, according to Highland, "the parties proceeded to document the transaction and prepare for settlement." Id. ¶ 37.

At about the same time, McNaughton, through Boneparth, had been in active negotiations with Jones Apparel Group ("Jones") for a proposed merger/acquisition. See id. ¶ 42. Highland alleges that, having learned that the Schneiders were about to trade the Notes, various officers of McNaughton met privately on March 8, 2001. Id. ¶¶ 43-44. Highland contends that, at this meeting, the officers "determined that they should inform the Schneiders . . . of the ongoing merger negotiations in order to persuade the Schneiders to forego selling the Notes" and their

remaining shares in McNaughton. Id. ¶ 45. Highland also alleges that it was determined that one of these McNaughton officers "should contact [JGPC] to inform them of the information regarding the Jones transaction." Id.

The amended complaint alleges that the McNaughton officer then contacted two attorneys at JGPC and informed them of the information concerning the McNaughton/Jones merger. See id. ¶¶ 19, 46. Highland claims that the two attorneys were then in contact with Leonard Schneider and some of the Schneider children. See id. ¶¶ 48-49. On March 13, 2001, a meeting was held at JGPC's New York office at which the two attorneys and all of the Schneiders were present, either in person or by telephone. Id. ¶ 50. Highland alleges that at this meeting, the attorneys informed the Schneiders of the possible McNaughton/Jones merger and advised the Schneiders not to sell either their McNaughton stock or the Notes. See id. ¶ 51.

Highland alleges that, upon learning this information, the Schneiders refused to proceed with the transaction. See id. ¶¶ 51-52, 54. At that point, however, Highland claims that the trade of the Notes "had already been made." Id. ¶ 52. Jones eventually reached an agreement to purchase McNaughton and the Schneiders received payment in full for the Notes shortly after the transaction closed. See id. ¶¶ 54-55. According to Highland, the Schneiders received a "windfall" of $34 million "for backing out of their agreement to sell the Notes." Id. ¶ 55.

B.  The Answers

In their answers, the Schneiders and JGPC deny, inter alia, that Rauch had the consent of the Schneiders to offer to sell the Notes to RBC, that the Schneiders (or Rauch on behalf of the Schneiders) agreed to sell the Notes, or that any information provided to the Schneiders by officials at McNaughton through the attorneys at JGPC was improper or used wrongfully. See

Schneiders' Answer With Affirmative Defenses and Third-Party Complaint (reproduced as Ex. 5 to Notice of Motion) ("Schneiders' Answer"), ¶¶ 1, 33, 35-36, 46-48, 50; Answer of Jenkens & Gilchrist Parker Chapin LLP With Affirmative Defenses (reproduced as Ex. 6 to Notice of Motion) ("JGPC Answer"), ¶¶ 1, 33, 35-36, 46-48, 50. The defendants also asserted a variety of affirmative defenses. See Schneiders' Answer ¶¶ 80-88; JGPC Answer ¶¶ 79-88. The Schneiders have set forth claims against RBC via a third-party complaint. See Schneiders' Answer ¶¶ 89-128.

C. Highland's Claims for Relief and Related Proceedings

Highland has listed seven causes of action in its amended complaint – five of which have been asserted against the Schneiders and two of which have been asserted against JGPC. Specifically, it is alleged that the Schneiders: (1) breached a binding agreement with Highland for the sale of the Notes, see Am. Compl. ¶¶ 56-60; (2) breached a preliminary agreement with Highland for the sale of the Notes, see id. ¶¶ 61-65; (3) tortiously interfered with Highland's rights under an agreement entered into between Highland and RBC by reneging on their agreement to sell the Notes, see id. ¶¶ 66-72; (4) tortiously interfered with Highland's rights under a prospective agreement with RBC and the business relationship between Highland and RBC by reneging on their agreement to sell the Notes, see id. ¶¶ 73-79; and (5) breached an agreement with RBC for the sale of the Notes, thereby preventing RBC from fulfilling its obligations to Highland, see id. ¶¶ 98-103. Highland also alleges that JGPC (1) tortiously interfered with agreements entered into between Highland and the Schneiders and Highland and RBC for the sale of the Notes, see id. ¶¶ 80-88; and (2) tortiously interfered with Highland's

rights under a prospective agreement between Highland and RBC and the business relationship between Highland and RBC, see id. ¶¶ 89-97.[1]

D. O'Shea's Proposed Testimony

O'Shea is an attorney in private practice who served as an Assistant United States Attorney in the United States Attorney's Office for the Eastern District of New York from 1986 to 1996. See Expert Report of Sean F. O'Shea (annexed as Ex. 1 to Notice of Motion) (referred to hereinafter as the "Report" or the "O'Shea Report") ("O'Shea Rpt."), ¶¶ 1-2, 4. O'Shea served as Chief of that Office's Business/Securities Fraud Unit from 1989 to 1996. Id. ¶ 2. At Highland's request, O'Shea has opined as to whether the conduct of certain individuals involved in the transaction at issue constituted a criminal violation of the securities laws and how a prosecutor would treat that conduct. See Deposition of Sean F. O'Shea (reproduced as Ex. 2 to Notice of Motion), at 41-44. In order to conduct that analysis, Highland's counsel provided O'Shea with access to "all of the pleadings . . . and all of the discovery produced in this matter (including all documents and all deposition testimony)." O'Shea Rpt. ¶ 7 (footnotes omitted).

O'Shea's conclusions are contained in the Report. In the Report's first substantive section, labeled "Facts," O'Shea relies on deposition testimony and documentary evidence to recite the history of the purported dealings between the Schneiders and Highland, among others. See id. ¶¶ 8-35. In the closing paragraphs of the "Facts" section, O'Shea opines as to what were

---

[1]In a separately-filed motion, the defendants have moved for summary judgment pursuant to Fed. R. Civ. P. 56 and for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) with respect to all claims asserted by Highland in the amended complaint. See Defendants' Memorandum of Law in Support of Motions for Summary Judgment, filed January 18, 2005 (Docket #96). Highland has opposed this motion. See Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment, filed March 11, 2005 ("Pl. SJ Mem.") (Docket #113).

the "effects" of the Schneiders' learning of the McNaughton/Jones merger. <u>See</u> <u>id.</u> ¶¶ 36-39. In the following two sections of the Report – labeled "Considerations in the Prosecution of Securities Fraud Violations" and "Legal Basis for Criminal Securities Fraud Prosecutions" – O'Shea details the factors that prosecutors take into consideration in determining whether to prosecute alleged violations of the securities laws, <u>see</u> <u>id.</u> ¶¶ 40-43, and sets forth the governing statutes and case law that underlie criminal violations of the securities laws, <u>see</u> <u>id.</u> ¶¶ 44-57. These sections include a discussion of Section 10(b) of the Securities Exchange Act of 1934 ("Section 10(b)") and Rule 10b-5, 17 C.F.R. § 240.10b-5, as well as federal statutes prohibiting, <u>inter alia</u>, mail fraud, wire fraud, and conspiracy to commit these crimes. <u>Id.</u> ¶¶ 44-45. O'Shea discusses, through reference to case law, the type of conduct that he believes would constitute a criminal violation of Section 10(b) and Rule 10b-5. <u>See</u> <u>id.</u> ¶ 46. In addition, O'Shea refers to case law to define various legal terms pertaining to securities fraud, including "market manipulation," "insider trading," "tippers," "tippees," "material" information and "non-public" information. <u>See</u> <u>id.</u> ¶¶ 47-48, 51, 55-56.

In the next section of the Report, labeled "Summary of Conclusions," O'Shea states that, based upon his "experience as an Assistant United States Attorney," it is his opinion: (1) that information pertaining to, <u>inter alia</u>, McNaughton's financial condition and to the McNaughton/Jones merger constitutes "material, non-public information concerning McNaughton"; (2) that certain individuals "are subject to criminal prosecution" for manipulating the market price of McNaughton stock; and (3) that certain individuals "are subject to criminal prosecution for insider trading" arising from the use of inside information. <u>See</u> <u>id.</u> ¶¶ 58(a)-(d). In the next section of the Report, labeled "Explanation of Conclusions," O'Shea reviews the

evidence provided by Highland and, applying his construction of the law to this evidence, explains why he believes that the conduct of the individuals involved in these transactions was illegal. See id. ¶¶ 59-75.

In the final section of the Report, labeled "Conclusion," O'Shea opines that the conduct of certain named individuals involved in the transaction "was wrongful and violative of the criminal law" and that "a federal prosecutor faced with the foregoing facts, information and caselaw would likely pursue a criminal investigation of" certain named individuals, "would present all of the foregoing to a Grand Jury, and would ask that Grand Jury to return indictments." See id. ¶ 76.

E.  The Instant Motion

Defendants have now moved pursuant to Rules 104, 401, 402, 403 and 702 of the Federal Rules of Evidence to exclude O'Shea's proposed expert testimony. See Notice of Motion; Ash Aff. ¶ 2; Reply Affidavit of Katherine C. Ash in Further Support of Motion to Exclude Proposed Expert Testimony of Sean O'Shea, dated March 31, 2005, ¶ 2; Defendants' Memorandum of Law in Support of Motion to Exclude Proposed Expert Testimony of Sean O'Shea, dated February 9, 2005 ("Def. Mem."); Defendants' Reply Memorandum of Law in Support of Motion to Exclude Proposed Expert Testimony of Sean O'Shea, dated March 31, 2005.  Defendants argue, inter alia, that O'Shea's proposed testimony, as stated in the Report, is inadmissible and must be excluded because (1) the "proffered opinion testimony is a series of legal conclusions and opinions as [to] the state of the law and as to how, in [O'Shea's] view, the law ought to be applied to the facts" of this case; (2) the "factual narrative" contained in the Report "does not assist the trier of fact and is unnecessary and irrelevant"; (3) throughout the Report there are

"[i]nadmissible musings on the intentions and motivations of defendants and non-parties";

(4) the proposed testimony improperly "rests on [O'Shea's] evaluation and determination of the

credibility of witnesses"; and (5) the Report "contains opinions on subjects on which O'Shea

does not profess to have, or lacks, expertise." Def. Mem. at 11, 17, 20, 22-23.

Highland has submitted papers in opposition to defendants' motion to exclude. See

Plaintiff's Memorandum in Opposition to Defendants' Motion to Exclude Proposed Expert

Testimony of Sean O'Shea, dated March 11, 2005 ("Pl. Mem."). Highland requests that

defendants' motion to exclude be denied or, in the alternative, that the consideration of the

motion be delayed until "at or shortly before trial when [d]efendants' concerns can be placed in

[the] context of the trial at hand." Id. at 1. Highland also requests "leave to supplement the

O'Shea Report in accordance with any rulings made on this motion." Id. at 21.

## II. APPLICABLE LEGAL PRINCIPLES

### A. Motion in Limine Standard

"The purpose of an in limine motion is to aid the trial process by enabling the Court to

rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are

definitely set for trial, without lengthy argument at, or interruption of, the trial." Palmieri v.

Defaria, 88 F.3d 136, 141 (2d Cir. 1996) (citation and internal quotation marks omitted); accord

Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. L.E. Myers Co. Group, 937 F. Supp. 276, 283

(S.D.N.Y. 1996). "A motion in limine to preclude evidence calls on the court to make a

preliminary determination on the admissibility of the evidence under Rule 104 of the Federal

Rules of Evidence." Commerce Funding Corp. v. Comprehensive Habilitation Servs., Inc., 2004

WL 1970144, at *4 (S.D.N.Y. Sept. 3, 2004) (citing Fed. R. Evid. 104(a)). "Evidence should be

excluded on a motion in limine only when the evidence is clearly inadmissible on all potential

grounds." Id. (citing Baxter Diagnostics, Inc. v. Novatek Med., Inc., 1998 WL 665138, at *3

(S.D.N.Y. Sept. 25, 1998)); accord SEC v. U.S. Environmental, Inc., 2002 WL 31323832, at *2

(S.D.N.Y. Oct. 16, 2002).  A district court's in limine ruling "is subject to change when the case

unfolds, particularly if the actual testimony differs from what was contained in the . . . proffer."

Luce v. United States, 469 U.S. 38, 41 (1984); accord U.S. Environmental, 2002 WL 31323832,

at *2.

        B.  Admission of Expert Testimony

        Federal Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier
> of fact to understand the evidence or to determine a fact in issue, a witness
> qualified as an expert by knowledge, skill, experience, training, or education,
> may testify thereto in the form of an opinion or otherwise, if (1) the testimony
> is based upon sufficient facts or data, (2) the testimony is the product of
> reliable principles and methods, and (3) the witness has applied the principles
> and methods reliably to the facts of the case.

The Rule 702 standard incorporates the principles enunciated in Daubert v. Merrell Dow

Pharmaceuticals, Inc., 509 U.S. 579, 589, 597 (1993), in which the Supreme Court held that trial

courts have a "gatekeeping" function to "ensure that any and all scientific testimony or evidence

admitted is not only relevant, but reliable," and Kumho Tire Co., Ltd. v. Carmichael, in which

the Supreme Court held that Daubert's general gatekeeping obligation "applies not only to

testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other

specialized' knowledge."  526 U.S. 137, 141 (1999) (citing Fed. R. Evid. 702).

     "One of the fundamental requirements of Rule 702 is that the proposed testimony 'assist

the trier of fact to understand the evidence or to determine a fact in issue.'"  In re Rezulin

Products Liab. Litig., 309 F. Supp. 2d 531, 540 (S.D.N.Y. 2004) (quoting Fed. R. Evid. 702);

accord Lippe v. Bairnco Corp., 288 B.R. 678, 685 (S.D.N.Y. 2003), aff'd, 2004 WL 1109846, at

*1 (2d Cir. May 17, 2004); see also In re Initial Pub. Offering Sec. Litig., 174 F. Supp. 2d 61, 68

(S.D.N.Y. 2001) ("As Rule 702's plain language shows, the opinion of an expert witness is only

admissible if it (1) assists the trier of fact in (2) understanding the evidence or determining a

disputed fact.") (emphasis in original).  In deciding whether expert testimony will be helpful to

the fact-finder, the Court must determine whether the testimony "usurp[s] either the role of the

trial judge in instructing the jury as to the applicable law or the role of the jury in applying that

law to the facts before it."  United States v. Lumpkin, 192 F.3d 280, 289 (2d Cir. 1999) (quoting

United States v. Duncan, 42 F.3d 97, 101 (2d Cir. 1994)) (internal quotation marks omitted);

accord United States v. Bilzerian, 926 F.2d 1285, 1294 (2d Cir.), cert. denied, 502 U.S. 813

(1991).  While an expert "may opine on an issue of fact within the jury's province," an expert

"may not give testimony stating ultimate legal conclusions based on those facts."  Bilzerian, 926

F.2d at 1294; see also Hygh v. Jacobs, 961 F.2d 359, 363 (2d Cir. 1992) ("This circuit is in

accord with other circuits in requiring exclusion of expert testimony that expresses a legal

conclusion.") (citing cases).  In addition, expert testimony is inadmissible when it addresses "lay

matters which a jury is capable of understanding and deciding without the expert's help."

Andrews v. Metro N. Commuter R.R. Co., 882 F.2d 705, 708 (2d Cir. 1989) (citing cases).

Moreover, as with all testimony, the expert's testimony must actually be relevant to an issue in

the case.  See, e.g., United States v. Cruz, 363 F.3d 187, 192 (2d Cir. 2004).

## III.  ANALYSIS

The question before the Court is whether the substance of the Report is admissible inasmuch as the Report reflects the testimony that O'Shea would offer as a witness at trial.  First, we discuss the admissibility of each substantive section of the Report.  Next, we address Highland's request that the Court's ruling be deferred until trial or that it be allowed to amend the Report.

### A.  The Admissibility of the O'Shea Report

#### 1.  The Narrative/Factual Section of the O'Shea Report

In the section entitled "Facts," the O'Shea Report marshals Highland's evidence concerning the alleged dealings between Highland and the Schneiders.  See O'Shea Rpt. ¶¶ 8-35. O'Shea declares that he conducted this analysis based upon his review of "the complaint and certain other pleadings in this matter," the exhibits used during the course of the depositions, and certain deposition transcripts.  Id. ¶ 7.

To the extent that O'Shea is simply rehashing otherwise admissible evidence about which he has no personal knowledge, such evidence – taken on its own – is inadmissible.  While an expert must of course rely on facts or data in formulating an expert opinion, see Fed. R. Evid. 703, an expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence.  See Rezulin, 309 F. Supp. 2d at 551 (rejecting portions of plaintiffs' expert's testimony that was "a narrative reciting selected regulatory events" because "[s]uch material, to the extent it is admissible, is properly presented through percipient witnesses and documentary evidence"); LinkCo, Inc. v. Fujitsu Ltd., 2002 WL 1585551, at *1-*2 (S.D.N.Y. July 16, 2002) (where expert's report was based on a review of, inter alia, "documents,

computer documents, computer files, deposition transcripts and exhibits," the "testimony by fact witnesses familiar with those documents would be far more appropriate . . . and renders [the expert witness'] secondhand knowledge unnecessary for the edification of the jury") (citation and internal quotation marks omitted) (alterations in original); <u>Media Sport & Arts s.r.l. v. Kinney Shoe Corp.</u>, 1999 WL 946354, at *3 (S.D.N.Y. Oct. 19, 1999) (where expert's testimony "is not based on personal knowledge, but instead on his review of documents and depositions produced by the parties," the expert's testimony "may not take the place of that of the individuals who actually negotiated the deal") (citations omitted); <u>Taylor v. Evans</u>, 1997 WL 154010, at *2 (S.D.N.Y. Apr. 1, 1997) (rejecting portions of expert report on the ground that the testimony consisted of "a narrative of the case which a lay juror is equally capable of constructing"). Because the "Facts" section of the O'Shea Report contains a factual narrative of the case and addresses "lay matters which a jury is capable of understanding and deciding without the expert's help," <u>Andrews</u>, 882 F.2d at 708 (citations omitted), it is inadmissible.

The Report's narrative also includes O'Shea's own speculation regarding the state of mind and motivations of certain parties who were involved in the relevant transaction, often without citation to any record evidence. For example, he asserts that an individual involved in the transaction was "likely aware" that certain parties to the transaction could be preparing to sell stock and that this individual was "also likely concerned" that the sale of the stock could "depress the market price of McNaughton stock." <u>See</u> O'Shea Rpt. ¶ 23 (footnote omitted); <u>accord</u> <u>id</u>. ¶ 24 (an individual "was likely concerned" that any purchaser of the Notes could "gain a substantial voice in, if not control over" McNaughton if the Notes were converted to McNaughton stock following a merger/acquisition); <u>id.</u> ¶ 26 (an individual "knew that the

14

Schneiders would not sell the . . . Notes if they knew that McNaughton was contemplating entering into a merger/acquisition transaction with Jones").  Indeed, throughout the Report, O'Shea commonly interjects his opinion as to the state of mind and knowledge possessed by defendants and non-parties to this action, see id. ¶¶ 18, 23-24, 26, and speculates as to how obtaining information concerning the McNaughton/Jones merger affected the Schneiders' actions, see id. ¶¶ 36-39.

None of this speculation is admissible either.  These sorts of comments consist simply of inferences that O'Shea draws from other evidence in the case.  Whatever expertise O'Shea may possess, no expert may "supplant the role of counsel in making argument at trial, and the role of the jury [in] interpreting the evidence."  Primavera Familienstifung v. Askin, 130 F. Supp. 2d 450, 529 (S.D.N.Y. 2001); accord Rezulin, 309 F. Supp. 2d at 541.  Thus, "[i]nferences about the intent or motive of parties or others lie outside the bounds of expert testimony."  Rezulin, 309 F. Supp. 2d at 547; accord id. at 546 ("[P]laintiffs' experts propose improperly to assume the role of advocates for the plaintiffs' case by arguing as to the intent or motives underlying the conduct of [the defendant] or others, a transgression that has resulted in the exclusion of 'expert' testimony as to the 'real motive' behind certain business transactions.") (quoting Lippe, 288 B.R. at 688); LinkCo, 2002 WL 1585551, at *2 (rejecting plaintiff's expert's report because the report "'does no more than counsel for [plaintiff] will do in argument, i.e., propound a particular interpretation of [defendant]'s conduct'") (quoting Primavera, 130 F. Supp. 2d at 530) (alterations in original).  Such testimony "is improper . . . because it describes 'lay matters which a jury is capable of understanding and deciding without the expert's help.'"  Rezulin, 309 F. Supp. 2d at 546 (quoting Andrews, 882 F.2d at 708); see also Taylor, 1997 WL 154010, at *2 (the expert's

"musings as to defendants' motivations" as stated in the expert's report "would not be admissible if given by any witness -- lay or expert").

In sum, because the "Facts" section of the Report (¶¶ 8-39) offers only "factual narratives and interpretations of conduct or views as to the motivation of parties," Rezulin, 309 F. Supp. 2d at 541 (citations and footnotes omitted), it is inadmissible.

2. Discussion of Securities Laws

Another portion of the Report is devoted to O'Shea's discussion of the federal securities laws, including statutes and cases. See O'Shea Rpt. ¶¶ 44-57. O'Shea also defines various technical legal terms pertaining to securities fraud, including "market manipulation," "insider trading," "tippers," "tippees," "material" information, and "non-public" information. See id. ¶¶ 47-48, 51, 55-56. To the extent O'Shea discusses governing law, the discussion is inadmissible because "[i]t is not for witnesses to instruct the jury as to applicable principles of law, but for the judge." Marx & Co., Inc. v. Diners' Club Inc., 550 F.2d 505, 509-10 (2d Cir.), cert. denied, 434 U.S. 861 (1977). Thus, "it is . . . erroneous for a witness to state his opinion on the law of the forum." Id. at 510 (citing cases); cf. Adalman v. Baker, Watts & Co., 807 F.2d 359, 368 (4th Cir. 1986) (trial court did not err in refusing to allow plaintiffs' expert, an attorney, to testify at trial where "[f]rom beginning to end, it is obvious that [plaintiffs] proffered [the expert] as an expert witness to testify in substantial part to the meaning and applicability of the securities laws to the transactions [at issue], giving his expert opinion on the governing law"), disapproved on other grounds, 486 U.S. 622 (1988); see also Roundout Valley Cent. Sch. Dist. v. Coneco Corp., 321 F. Supp. 2d 469, 480 (N.D.N.Y. 2004) ("[T]o make it abundantly clear for the

parties, it is axiomatic that an expert is not permitted to provide legal opinions, legal conclusions, or interpret legal terms; those roles fall solely within the province of the court.") (citing cases).

The Report goes on to apply these generic legal principles to the facts of the instant case, resulting in O'Shea's giving his opinion that the securities laws have in fact been violated. <u>See</u> O'Shea Rpt. ¶¶ 58-76. For example, O'Shea opines that the actions of certain parties in refusing to proceed with a purported "contractual commitment to sell the . . . Notes" constituted a purchase or sale of a security within the meaning of Section 10(b) and Rule 10b-5, and thereby subjected these individuals to "criminal prosecution" for violating the securities laws. <u>See</u> O'Shea Rpt. ¶¶ 68-70. To arrive at his conclusion, O'Shea opines that information pertaining to McNaughton's financial condition and the McNaughton/Jones merger constituted "material, non-public information," <u>id.</u> ¶ 58(a), that certain individuals "acted to manipulate the market price for McNaughton stock," <u>id.</u> ¶ 61, that certain individuals "violated" a "direct fiduciary duty to McNaughton" by failing to keep "[i]nside [i]nformation" concerning the McNaughton/Jones merger "confidential," <u>id.</u> ¶ 63, and that other individuals, after being "tipped" with information relating to the McNaughton/Jones merger, "violated" their "derivative fiduciary duties to McNaughton" by failing to keep "[i]nside [i]nformation" confidential, <u>id.</u> ¶ 66. O'Shea then goes on to conclude that the conduct of certain defendants and non-parties "was wrongful and violative of the criminal law." <u>See id.</u> ¶ 76.

This type of expert testimony is not permitted. It is inadmissible because it usurps the jury's role in finding the facts and applying those facts to the law as instructed by the court. <u>See</u> <u>Marx</u>, 550 F.2d at 510 (admission of expert testimony at trial was improper where witness "repeatedly gave his conclusions as to the legal significance of various facts adduced at trial" that

were "based . . . on his examination of documents and correspondence . . . which were equally before the judge and jury" because such testimony "amounts to no more than an expression of the (witness') general belief as to how the case should be decided") (citation and internal quotation marks omitted).  There is no reason why a jury in this case could not apply the law to the facts it finds to determine whether there has been a violation of the securities laws.

The testimony is also inadmissible because it runs afoul of case law providing that, while "an expert may opine on an issue of fact within the jury's province, he may not give testimony stating ultimate legal conclusions based on those facts." Bilzerian, 926 F.2d at 1294.  The testimony here is essentially the same as what was barred in United States v. Scop, in which the Second Circuit held that an expert had improperly testified that defendants had engaged in a "manipulative and fraudulent scheme" within the meaning of the securities laws.  See 846 F.2d 135, 138, 140 (2d Cir.), modified on other grounds, 856 F.2d 5 (2d Cir. 1988); see also Hygh, 961 F.2d at 362 (in civil rights action, expert testimony that defendant's conduct constituted "deadly physical force" that was not "justified under the circumstances" and that the defendant's conduct was "totally improper" not admissible) (internal quotation marks omitted); Andrews, 882 F.2d at 709 (expert testimony that defendant was "negligent" improper in a personal injury action) (internal quotation marks omitted).

Highland relies extensively in its brief on two decisions in support of its argument that defendants' motion to exclude O'Shea's proffered testimony should be denied: In re Blech Sec. Litig., 2003 WL 1610775 (S.D.N.Y. Mar. 26, 2003), and U.S. Environmental, 2002 WL 31323832.  In these cases, however, the courts allowed testimony from experts within the securities industry merely to discuss the ordinary practices and usages of that industry, and

specifically barred testimony that stated a legal conclusion.  See Blech, 2003 WL 1610775, at

*21 (permitting expert to testify "as to the customs and practices of the industry" but not as to

whether certain trading was "proper" or constituted "parking or . . . stock manipulation"); U.S.

Environmental, 2002 WL 31323832, at *3, *5 (permitting testimony of expert witness regarding

the "practices and usages" of the securities trading industry based upon his "knowledge of the

standard practices of the securities industry" and his "knowledge of typical trading activity and

the types of trading patterns that an experienced trader would recognize as irregular," but not

permitting the expert to testify as to whether defendants "were actively participating in a

manipulation" due in part because such testimony was "more along the lines of a legal

conclusion") (citations and internal quotation marks omitted); see also Bilzerian, 926 F.2d at

1295 ("[T]estimony concerning the ordinary practices in the securities industry may be received

to enable the jury to evaluate a defendant's conduct against the standards of accepted practice.")

(citing Marx, 550 F.2d at 509).  The comparison with U.S. Environmental is particularly off the

mark since the expert in that case had conducted the useful exercise of analyzing transactions of

common stock between various entities – in particular, a series of "wash trades" – that

constituted "indirect evidence" of the market manipulation.  See 2002 WL 31323832, at *3

(internal quotation marks and citations omitted).  Here, by contrast, the Report provides no

"indirect evidence" of anything that would not be readily discernable to an ordinary juror.

Rather, it opines on whether the conduct of certain individuals involved in the transactions at

issue violated the federal securities laws and how a prosecutor purportedly would view the

conduct of these individuals.

Highland points the Court to Duncan, 42 F.3d at 102 n.4 and United States v. Russo, 74 F.3d 1383, 1388-89, 1395 (2d Cir.), cert. denied, 519 U.S. 927 (1996), to support its argument that "[s]ecurities experts and law enforcement officials are routinely allowed to assist the jury in understanding industry terms and materials, the characteristics of various types of criminal activity, and whether conduct in the underlying case is indicative of the criminal conduct alleged." Pl. Mem. at 9-10 (footnote omitted). Highland also apparently contends that three other decisions of the Second Circuit, see United States v. Brown, 776 F.2d 397, 400 (2d Cir. 1985), cert. denied, 475 U.S. 1141 (1986), United States v. Young, 745 F.2d 733, 760-61 (2d Cir. 1984), cert. denied, 470 U.S. 1084 (1985), and United States v. Carson, 702 F.2d 351, 369-70 (2d Cir.), cert. denied, 462 U.S. 1108 (1983), support this argument. See Pl. Mem. at 9 n.17.

Putting aside whether Highland's brief accurately characterizes the law, O'Shea has not offered testimony concerning "terms and materials" relevant to the securities industry – except for his discussion of securities law terms that could easily be explained by a judge to a jury. See O'Shea Rpt. ¶¶ 47-51, 54-56. Nor is this a case in which the expert describes the "characteristics" of criminal activity or opines as to whether the conduct of certain individuals was "indicative" of criminal activity. Rather, O'Shea states his opinion concerning the law governing securities fraud and concludes that the conduct of certain defendants' and non-parties violated that law. The Second Circuit cases cited by Highland offer no support for admission of this testimony. See Duncan, 42 F.3d at 102-03 (expert witness's testimony admissible where, although the expert "stated certain factual conclusions," his testimony did not "simply tell the jury what decision to make" and "he never expressed an opinion as to whether [defendant] was guilty of the offenses charged"); Russo, 74 F.3d at 1395 (expert testimony admissible where the

20

witness's testimony "focused solely on factual conclusions," "did not involve any legal characterizations," and where the witness "gave no opinion as to whether the appellants had violated the securities laws"); Brown, 776 F.2d at 400-03 (police officer's expert testimony admissible to explain that defendant's role was to serve as a "steerer" in charged drug transaction); Young, 745 F.2d at 761 (admission of expert's testimony that, through the search of an apartment, he found "precisely what he . . . would expect to find" in a heroin "mill" not "manifest error" where "the expert testimony related to the issues of fact that were properly before the jury" and the trial judge instructed the jury that the testimony did not concern "the facts or circumstances of [that] particular case") (internal quotation marks and citation omitted); Carson, 702 F.2d at 369 (not error for agents to testify that defendant's "furtive activity appeared to them to be sales of narcotics" where that testimony was based on their observations and the agents' "specialized knowledge, not possessed by the jury, of the manner in which drug transactions are conducted").

### 3.  Opinion as to Whether Individuals Would be Prosecuted and Indicted

The remaining portions of the O'Shea Report consist essentially of (1) O'Shea's view of the "considerations" a prosecutor should take into account in prosecuting securities fraud violations, see O'Shea Rpt. ¶¶ 40-43, and (2) O'Shea's conclusions about whether certain of the parties to the relevant transaction would be subject to criminal prosecution and indicted for their conduct, see id. ¶¶ 58(b)-(d), 62, 70-71, 75-76.

These factual matters, however, have no relevance to this matter.  Rule 702 specifically states that expert testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue."  See also Nook v. Long Island R.R. Co., 190 F. Supp. 2d 639, 641

(S.D.N.Y. 2002) ("In assessing admissibility, the Court must determine whether the proffered expert testimony is relevant.").  Courts have held that the "helpfulness requirement" of Rule 702 "is 'akin to the relevance requirement of Rule 401, which is applicable to all proffered evidence[,] [but] . . . goes beyond mere relevance . . . because it also requires expert testimony to have a valid connection to the pertinent inquiry.'"  Rezulin, 309 F. Supp. 2d at 540 (quoting 4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 702.03[1] (Joseph M. McLaughlin ed., 2d ed. 1997)) (alterations in original).

Highland's claims against the Schneiders and JGPC sound in breach of contract and tortious interference with contractual and business relations.  The Court will accept arguendo Highland's argument that the question of whether any defendant violated the securities law is relevant to these claims.  But it matters not to this case whether a federal prosecutor would investigate that violation, the "considerations" a prosecutor would weigh in prosecuting the violation, or whether the prosecutor would seek indictments from a grand jury.  Indeed, Highland has not even proffered a comprehensible argument as to why their prediction of what a federal prosecutor might have done with this case is of any relevance to their claims for relief.  As a result, all of this testimony is inadmissible.[2]

---

[2]Notably, even if these matters were relevant, these portions of the O'Shea Report would have to be struck because they lack "a sufficiently 'reliable foundation' to permit it to be considered" by the trier of fact.  Nook, 190 F. Supp. 2d at 641 (quoting Daubert, 509 U.S. at 597).  Rule 702 requires that "expert testimony rest on 'knowledge,' a term that 'connotes more than subjective belief or unsupported speculation.'"  Rezulin, 309 F. Supp. 2d at 543 (quoting Daubert, 509 U.S. at 590).  Expert testimony that is "speculative or conjectural," therefore, is inadmissible.  Boucher v. U.S. Suzuki Motor Corp., 73 F.3d 18, 21 (2d Cir. 1996) (citation omitted); accord Lippe, 288 B.R. at 686.

O'Shea provides no basis for his conclusion that it is "likely" that a federal prosecutor would investigate and prosecute the individuals named in the Report.  See O'Shea Rpt. ¶ 76.

B.  Deferring Consideration of the Motion and Request to Supplement the Report

        Finally, Highland contends that this Court should defer considering this motion until "at

or shortly before trial when [d]efendants' concerns can be placed in [the] context of the trial at

hand."  Pl. Mem. at 1.  Relatedly, Highland also requests that this Court grant it "leave to

supplement the O'Shea Report in accordance with any rulings made on this motion."  Id. at 21.

        These requests are denied.  As one court put it, the preclusion of testimony

> is an entirely appropriate measure when, as at present, the testimony a party seeks
> to present is simply inadmissible.  Indeed, the curative measures suggested . . .,
> such as permitting defendants to . . . supplement the report, will not alleviate the
> underlying defects in [the expert's] proffered testimony.  Here, I am not faced
> with an ambiguous report in need of clarification -- I am presented with a report
> containing testimony which a trial jury should not be allowed to consider. . . .
> [The] delay might be warranted if the expert's report contained potentially
> admissible testimony; the report now before the court does not.

Taylor, 1997 WL 154010, at *2-*3; see also Kidder, Peabody & Co., Inc. v. IAG Int'l

Acceptance Group, N.V., 14 F. Supp. 2d 391, 404 (S.D.N.Y. 1998) ("Second Circuit authority

_____

While O'Shea avers that it is his "experience as an Assistant United States Attorney" that led him
to reach his conclusions, see id., this fact alone does not make his opinion reliable.  Courts have
held that "an expert basing his opinion solely on experience 'must do more than aver
conclusorily that his experience led to his opinion,' and . . . must do more than 'propound a
particular interpretation of [a party's] conduct.'"  Lippe, 288 B.R. at 686 (quoting Primavera, 130
F. Supp. 2d at 530) (alteration in original).  "Rather, an expert who is relying 'solely . . . on
experience . . . must explain how that experience leads to the conclusion reached, why that
experience is a sufficient basis for the opinion, and how that experience is reliably applied to the
facts.'"  Id. (citing Fed. R. Evid. 702 advisory committee's note) (alterations in original).  The
O'Shea Report does none of these things and thus is inadmissible.  See Dora Homes, Inc. v.
Epperson, 344 F. Supp. 2d 875, 889 (E.D.N.Y. 2004) (rejecting expert's "subjective" and
speculative opinion as "patently devoid of reliability"); Rezulin, 309 F. Supp. 2d at 543 (rejecting
expert witnesses' testimony as unreliable where the testimony was based on the witnesses'
"personal, subjective views") (footnote omitted); see also U.S. Info. Sys., Inc. v. Int'l Bhd. of
Elec. Workers Local Union Number 3, AFL-CIO, 313 F. Supp. 2d 213, 227 (S.D.N.Y. 2004)
(one factor for courts to consider in determining reliability is "whether the expert's technique can
be challenged in some objective sense, or whether it is instead simply a subjective, conclusory
approach that cannot reasonably be assessed for reliability") (citing Daubert, 509 U.S. at 593-94).

requires me to preclude [the expert's] opinion testimony, as set forth in his written report. The detailed reasoning contained in that report makes it unnecessary to defer this conclusion until his deposition has been taken or the trial has begun."). Because this is not a case where "the validity of [the] objections to . . . the challenged expert testimony will become apparent only at trial," AUSA Life Ins. Co. v. Dwyer, 899 F. Supp. 1200, 1201-02 (S.D.N.Y. 1995) (citing cases), the proposed expert testimony may now be excluded.

To the extent Highland seeks leave to submit an amended report in the event of preclusion, that request too must rejected as it was in Taylor, where leave was denied on the ground that "plaintiffs . . . presented a report comprised almost completely of inadmissible material." 1997 WL 154010, at *3; see also Weisgram v. Marley Co., 528 U.S. 440, 455 (2000) ("It is implausible to suggest, post-Daubert, that parties will initially present less than their best expert evidence in the expectation of a second chance should their first try fail."). Moreover, it would be unfair to defendants to allow the submission of a new report now that discovery has closed.

Conclusion

For the foregoing reasons, defendants' motion to exclude O'Shea's proposed expert testimony is granted and Highland's request to supplement the O'Shea Report is denied.

Dated: July 19, 2005
       New York, New York

_____
GABRIEL W. GORENSTEIN
United States Magistrate Judge

Copies sent to:

Paul B. Lackey
Jamie R. Welton
Deborah Deitsch-Perez
Lackey Hershman, L.L.P.
3102 Oak Lawn Ave, Suite 777
Dallas, TX 75219-4241

Katherine C. Ash
Troutman Sanders LLP
405 Lexington Avenue
New York, NY 10174

Jack Yoskowitz
Seward & Kissel LLP
1 Battery Park Plaza
New York, NY 10004

requires me to preclude [the expert's] opinion testimony, as set forth in his written report. The detailed reasoning contained in that report makes it unnecessary to defer this conclusion until his deposition has been taken or the trial has begun."). Because this is not a case where "the validity of [the] objections to . . . the challenged expert testimony will become apparent only at trial," AUSA Life Ins. Co. v. Dwyer, 899 F. Supp. 1200, 1201-02 (S.D.N.Y. 1995) (citing cases), the proposed expert testimony may now be excluded.

To the extent Highland seeks leave to submit an amended report in the event of preclusion, that request too must rejected as it was in Taylor, where leave was denied on the ground that "plaintiffs . . . presented a report comprised almost completely of inadmissible material." 1997 WL 154010, at *3; see also Weisgram v. Marley Co., 528 U.S. 440, 455 (2000) ("It is implausible to suggest, post-Daubert, that parties will initially present less than their best expert evidence in the expectation of a second chance should their first try fail."). Moreover, it would be unfair to defendants to allow the submission of a new report now that discovery has closed.

Conclusion

For the foregoing reasons, defendants' motion to exclude O'Shea's proposed expert testimony is granted and Highland's request to supplement the O'Shea Report is denied.

Dated: July 19, 2005
     New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge